Our next case this morning is Navient Solutions v. Lohman. Mr. Calhoun, welcome to the Fourth Circuit, Mr. Calhoun. Thank you, Your Honor. Good to have you with us. May it please the Court, George Calhoun, IFRA, PLLC, on behalf of the appellant, Navient Solutions, LLC. I am happy to be here. The last time I argued before the Court, it was over Zoom, and this is much more pleasant. This case involves the misapplication of the standard for a Rule 50 motion and improper removal of a jury's verdict. This case involved RICO, fraud, torturous interference. We had a week-long jury trial in August of 2021. The jury found that the defendants had engaged in a fraudulent RICO conspiracy that injured Navient by using fraudulent marketing practices to entice borrowers into a phony debt relief scheme. They had further attempted to further this scheme by targeting Navient with manufactured TCPA claims. The jury carefully considered all the issues, deliberated for four days, asked multiple questions. Notably here, the defendants are not challenging the critical instructions. The District Court, however, deferred ruling on the post-trial motions for two years. That alone should give an indication that the District Court wasn't certain about what to do here. And typically, a J&OV decision should be for cases that are clear, that are easy because there's no evidence. And that's really the standard that's here. The Seventh Amendment places great... Well, I mean, you've got to be a little careful in the two years. That's a bit dangerous for us to think about outside events. I mean, we look at orders and things that happen within the judicial process, don't we? I mean, you're suggesting time indicates it was a closer call. Maybe that indicates that. Maybe that indicates something else. Fair enough, Your Honor, and we'll go into the actual opinion and decisions because I think that's where... Make whatever argument you want, but I think it would be more effective to stick to the merits of it. Fair enough, Your Honor. The Seventh Amendment places great constraints on a court's authority to overturn a jury verdict. And the standard is either a reasonableness or substantial evidence standard. And that's a more stringent standard than a clear error standard when a judge makes a factual finding. So what we have here is for this court to decide, did the jury make an explicit or implicit finding on the issue? And if there's any record evidence to support that finding. If the answers to those questions are yes, then you have to reverse. The ultimate ruling by the district court that we contend is error here is that the district court ruled that Navient caused its own injuries by violating the TCPA because the TCPA litigation was not sham litigation. This is error for multiple reasons. First, there was no evidence in the case that Navient violated the TCPA. In fact, that was an issue that was discussed in Motions to Eliminate before the trial. It was explicitly excluded. The judge did not allow evidence about compliance with the TCPA. Whether or not Navient violated the TCPA was not an issue in the case. She said that repeatedly. She denied any testimony that was going to whether or not Navient was in fact complying with the TCPA. So in excluding that issue from the case and then basing her ruling on causation on the allegation that Navient in fact violated the TCPA, she committed error. In fact, there was some evidence in the case that Navient did not use an auto dialer, which would have precluded a finding that Navient violated the TCPA. There's simply no evidence to support the finding and conclusion of the district court that Navient violated the TCPA. That is the issue that the district courts say. I don't think the district court's conclusion was that there was or was not a violation of that statute. The district court's conclusion was that in order to get the damages that you put up, which as I understand it were just attorney's fees. That was the evidence that was put in as attorney's fees. As I recall, the district court said if that's your evidence, the only way you're going to get attorney's fees of damages is if the litigation was sham evidence or sham litigation. And without deciding whether there was a violation or not, the district court said there was at least enough evidence presented that it wasn't sham or frivolous or bad faith sort of litigation. Not who was going to win or lose if there was ultimately a specific claim there. Isn't that how it was resolved? A couple of responses to that, Your Honor. One, I'd invite you to reread the district court's opinion because there was an express statement that Navient violated the TCPA. Okay. So I disagree with that characterization. Second, we also presented evidence that Navient was damaged by loans that weren't repaid and by settlements that it made. So the issue of attorney's fees was one element of the damages. But one part of the damages that we put on evidence and proved was that Navient was damaged when these borrowers were instructed by the scheme participants not to pay their loan. In our damages calculations, we only used the individuals who eventually went into litigation just as a matter of convenience. But we put on evidence that when a borrower was instructed to stop paying and stopped paying, that that damaged Navient. It went to the bottom line of Navient. But you didn't. I mean, you made that argument for sure that borrowers were instructed not to pay. But did you put up, did you say, okay, here are our damages. In the record, we have what you put up as damages. Is there a calculation? Is there a witness who said, here are my attorney's fees damages. Here's my nonpayment damages. For the nonpayment damages, what we had was the amount of the loans that were ultimately not paid or written off. So there was a column. I can give you the exhibit number. I have to take it out, but I'll do that. I'd like the J sites where you put up damages other than attorney's fees. Yeah, I'll give that to you. You can do that on the rebuttal. The second piece of this is the district court said that you only get the damages if it's not sham litigation, which is incorporating, the defendants had made an argument that Nora Pennington applied to the litigation. As an aside, whether Nora Pennington applied would only apply to matters that were in litigation. It wouldn't apply necessarily to private arbitrations, which is the vast bulk of these cases. But she seems to have merged that Nora Pennington sham litigation argument into her ruling. She doesn't discuss Nora Pennington in the ruling. The district court didn't do that. But she's adopted the sham litigation concept, which is not one that appeared in the causation instruction or anywhere else. But in doing so, she didn't apply this court's sham litigation standard from the Wall Chapel South decision. How should we analyze the pre-litigation conduct under Nora Pennington? How should we do it? Or do we have to? I don't think the pre-litigation conduct has anything to do with Nora Pennington. I don't think Nora Pennington applies to that. So what you have here is we have a RICO conspiracy found by the jury, and you have a series of conducts. We likened it to a pipeline where the participants in the scheme, first the marketers, would go out and send phony marketing materials to borrowers, tice them in. They would then meet with another customer service rep, an attorney. The whole plan, as is in the evidence, was that they didn't have a plan, that the plan to resolve this debt was either through manufacturing a lawsuit or by the statute of limitations. They never actually did any debt relief work. All of that work. You're saying, let me make sure I understand, there's no pre-litigation conduct that we should analyze under Nora Pennington. Nora Pennington only applies to petitioning activity. It's a First Amendment concept. It applies to petitioning the government. That applies to both administrative, judicial, other branches. But non-litigation activity, things that they're interacting on a private basis with consumers, is not protected activity. It's not petitioning activity. So only once they take the step to initiate litigation would Nora Pennington come into effect. And a lot of the conduct that is at issue in this case was not, even under the concept of representation, there was evidence that the Lowman defendants had a call center that would deal with all of these cases that were coming in. They would instruct them on how to revoke consent under the TCPA. They would tell them about the importance of getting calls. They wouldn't take their case if they were still paying. There was some email suggesting that they did, in fact, instruct them not to pay. That was all in an effort to create a factual situation where they could even begin to bring a case. And that was before an engagement agreement was signed. So was the underlying litigation baseless? Oh, very much so, we believe, Your Honor. There was a dispute about that. But, in fact, Navient was not using an auto dialer, was not violating the TCPA. The ultimate crux of all of this is the only way they had to continue this program, where they were collecting millions of dollars from consumers, was to manufacture TCPA claims. So they would testify in arbitrations. They would have their borrowers testify in arbitrations. They would call Navient and say we didn't want calls. But, ultimately, this all depended on their wanting calls. So there's evidence in the record from one borrower, for example, who called Navient, changed her phone number from a landline, which isn't subject to TCPA, to a cell number and then stopped paying in the effort to induce calls to her cell phone. So they wanted these calls. So whether that's a Spokio standing issue or something else, in fact, they encouraged, they took steps to increase the numbers of calls. This was not a real dispute where they were going out and trying to help people who had calls they didn't want. They wanted the calls. But let me explore an issue that is a little bit different, maybe, than the claim as to the overall scheme as you characterize it. Because my reason for doing that is there may be, if we agree with you about the scheme being improper, then under RICO, at least, the damages need to be causally sufficiently connected. You're going to talk about the non-attorney's fees damages, but there's an issue about whether the attorney's fees damages would or would not be sufficiently connected. I know you disagree with that, but let me get to my other point so we don't get too off track. One of the claims that you have is just regular common law fraud, and it seemed like you introduced evidence that the Lowman defendants made representations to your client, that they represented borrowers, debtors, and the borrowers said they didn't know anything about them. Even if the order is sufficient on the RICO claims, is there evidence that would support the fraud claim for making representations to your client that they represented people that they did not? The representations that they made were they filed lawsuits without these people's knowledge. I won't go as far as to say they didn't know who they were. Didn't some witnesses say, is someone else our lawyer? Yes, because a lot of them thought they were represented by the other lawyers in the scheme, David Mize, for example. They didn't know who Lowman was, so there is evidence of that that the jury considered. I think that's sufficient on the fraud piece. There's other evidence that they were filing these lawsuits without their knowledge, that they were serving discovery responses that the individuals hadn't seen. There was some evidence on that. We think that's sufficient on that. And if you go back to the Walled Chapel South standard, if you're looking at whether this litigation was a sham and tying the fees to that, the jury was instructed properly to undertake a holistic evaluation, and they had substantial evidence of bad faith, which is the standard that this court set out in Walled Chapel South. There was dismissal of 20 obviously baseless cases where the Lowman firm couldn't even find their clients, didn't know who they were. There were other issues with those cases. There was Lowman's admission that he didn't know if Navient was using an auto dialer. There was the perverse fact that the defendants advised borrowers to take steps to increase the number of calls that they allegedly didn't want. There were borrowers lying about warning calls. They were filing lawsuits without clients knowing about it. There was the whole deceptive marketing practices of how they were recruiting borrowers into the scheme that was eventually shut down by the CPFP. There's the lack of a plan to deal with these claims. There's their knowledge that these arbitration proceedings jammed Navient up. And there was the fact that Lowman had testified that he hated Navient. That's sufficient for the jury to have concluded that these barrage of claims that were filed. I see my time's up, Your Honor. But this barrage of claims that was filed was not good-faith litigation. It was sham. The district court could not have overturned that unless she found no evidence. In fact, there was lots of evidence, meaning she had to have engaged in weighting of evidence, which was improper, Your Honor. Well, she said it was not sham litigation. After listening and being around those cases for what was a couple years, she concluded it's not sham litigation. Correct, Your Honor. That's what she wrote down. That's what she wrote down. But to have done that, she had to weigh evidence, which is not the Rule 50 standard. The Rule 50 standard is if there's evidence that the jury could have weighed, taking all the inferences in our favor and Navient's favor, then you have to sustain the jury's verdict. Thank you. Thank you very much, sir. And you saved some time. Mr. Grell? Yes, sir. Thank you. Good to have you with us, Mr. Grell. I'm glad to be here. And with me is Mr. Tom Urban, and Jeff Loman is also here in the gallery today. I want to address so many issues here. But first of all, this Noor-Pennington issue is a real issue here that has always concerned me about this case. In fact, ever since this case, I make sure I get an express release whenever I settle anything because what Navient did is they sued a lawyer for simply being a lawyer and for winning cases. Now, Your Honor, you were asking about their damage chart. It's on Joint Appendix 2603 and 2604. There were, let's see, if you do the math on this, their damages are based on 47 cases that were settled in favor of the Loman firm's clients, 47 cases. Five were resolved by arbitrators in favor of the Loman clients, and four were resolved in favor of Navient. I don't know how, and if you look at the Fisherman's case by this circuit, it says successful litigation is not sham litigation. How is that not successful? How is a lawyer who owes a duty to their clients to represent their clients supposed to stop suing Navient when Navient has paid 47 settlements? And when we asked Mr. Standish that question at trial, Mr. Standish said, well, you know, we just got to the point where we decided it was cheaper to settle these cases and then bring a RICO claim against Jeff Loman, and then we'd recover our damages on the backside. That is exactly what Norm Pennington is designed to protect. If you don't like the result in the first case, RICO, I don't care what other litigation theory you want to propose, malicious prosecution, doesn't give you a second bite at the apple. They didn't like the result. They didn't like the settlements that they entered into. They didn't like the arbitrator's awards against them. And so what do they do? They trump up a RICO claim that makes no sense, and then they sue Mr. Loman and a bunch of other lawyers in this firm for being successful, and they're calling it sham. That makes no sense on this planet. And if a lawyer can be sued for successfully settling cases, what are we doing? That's crazy. Why didn't the judge let it go on first of all? Well, and this goes to my question, to the issue that my colleague, Mr. Calhoun, brought up over and over again. There's substantial evidence to support the jury's verdict. He made that same claim on motions to dismiss, on motions for summary judgment. He made it throughout trial when Judge Brinkman was asking him, where's your evidence, where's your evidence, where's your evidence? And she gave him every benefit of the doubt. Mr. Loman was required to produce even his attorney-client privilege documents, which is part of our cross-appeal. Still, no evidence of fraud. And she saw it at the end of trial. And if you go to her transcript, she awarded a directed verdict in favor of Mr. Loman's co-defendant, another attorney in his firm, Jeremy Branch. And at Joint Appendix 1732-34, Judge Brinkman says, look, I'm awarding a directed verdict to Mr. Branch because there's no evidence to support this claim. But what happens is if this goes up on appeal, she anticipated the jury would rule in favor of Mr. Loman. I don't want, and the Court of Appeals decides I did something wrong, I don't want this case to come back without a verdict. So, Mr. Loman, I'm sorry, but I'm going to let this case go to the jury against you. And if the jury doesn't make the right decision, I can always rule in the post-trial motions. Now, I'm paraphrasing what she said, but that's essentially the message she conveyed. And she threw it out after the verdict came in.  But you filed a cross-appeal to – was that a protective appeal? Yeah, yeah. On a couple of issues, particularly on the one about attorney-client privilege on discovery. Right. If we were to affirm Judge Brinkema, what happens to the cross-appeal? Is it moot? I think it's moot, yeah. I mean, I think it's unfortunate. In our opinion, it's unfortunate that those clients were forced to give up their privilege. And Navient correctly points out that some of the clients waived the privilege. My client at the time of this litigation had no problem producing those documents, but it wasn't his privilege to waive. And we explained this to Judge Brinkema and Magistrate Judge Buchanan. We have to fight this because it's our client's privilege, and we can't just waive the privilege. If that's bad law, the ruling against you on the discovery, is that, as they say, in the book somewhere? I mean, even though you would end up – if we affirm. It's out there on Westlaw. And dismiss that cross-appeal as moot. That ruling is still in there somewhere. And we believe it is still problematic because when you look at her order on the privilege issue versus her final order on judgment, and you lay up the evidence of crime that she relied upon to waive the privilege, it's the same evidence that she relies upon to say there was no crime. And that's things like clients being told to record their phone calls. Well, anybody can record their phone calls, especially when Navion, every time they get on the phone with a borrower, they say this call is recorded. If Navion's recording the phone call, the recipient of the call can record it. When he says manufacturing claims, it's that kind of thing. Recording phone calls, logging phone calls, revoking consent, which Mr. Standish, Navion's corporate representative at trial, said point blank, absolutely borrowers have the right to revoke consent under the TCPA to receive phone calls. All this pre-litigation conduct that my clients engaged in, it's just lawyers being lawyers. If this was a Fortune 500 company advising that company about their rights under a federal statute, we would never be here. But Mr. Lohmann represents normal people who don't understand their rights, and he told them, you consented by signing your loan agreement, but you can always revoke that consent. And the one thing that Mr. Lohmann could not manufacture that Navion always glosses over is the phone calls. They made these phone calls. And when you ask whether this litigation was objectively baseless, absolutely not. We're not talking about two or three phone calls. We're talking about hundreds of phone calls. If you look at the arbitration awards that are part of the record, joint appendix 5681 through 5721, 233 calls, 226 calls, 235, 235, 163, 127. Those are the victims who went to arbitration. Those are the calls to try to collect the loans? Is that what their calls were? Yes. Their policy was to call a person. What's the time frame, the spacing between the calls? Well, that's unclear from the arbitration awards. It's the total amount of calls that these people received. Because there are no periods of time. You can do the math on it. Their policy, which Mr. Standish testified to during trial, is to call people eight times a day. And if they don't get a pickup, the next day they'll call eight times a day. If they do pick up on day one, day two, eight times a day. So you can basically, if you do the math, this is, I don't know, maybe a month, less than a month of phone calls. And Naviant made these calls knowing that the definition of an ATDS was unclear. And this is also undisputed in the evidence. Switching gears a little bit from whether it was sham or bad faith litigation or whatever. Is there evidence in the record? It seems like I've read stuff where some of the borrower's testimony could be construed as the loanman firm bringing an action without their consent. And I'm trying to, you know, jury verdicts mean something. The standard is pretty high. And even if there was not a RICO claim or a tortious interference claim, kind of for the reasons you've already talked about, if there's evidence that the loanman firm brought lawsuits without authorization from clients, could that support a common law fraud claim? No. Why is that? Well, first of all, when you say clients, plural, there was only one client that testified at trial. That's a gentleman named Brad Moore. No one else at trial testified. And when you read Naviant's brief, there are a lot of affirmative statements in there that have no cite to the joint appendix. And there are, I think, one or two times where he does cite the joint appendix to make that point, and it's the testimony of Brad Moore. Okay. Brad Moore says, I didn't get a call before they filed my arbitration demand. He doesn't say they didn't authorize it. He says, I didn't get a call before they filed the arbitration demand. Now, the testimony at trial was that, and Mr. Lohman testified at joint appendix 1278 through 1279, every client signed an engagement letter. Naviant never rebutted that testimony. The engagement letter is at supplemental appendix 184. That engagement letter authorizes Lohman to litigate the claims. Every client signed that. There was no evidence to the contrary. There couldn't be any evidence to the contrary because they called no borrowers to testify at trial. And so Mr. Moore's testimony does not support that assertion. It just indicates that he didn't review the arbitration demand before it was filed. And those demands are one sentence long. It's not like a complaint, certainly not a Rule 9b complaint under RICO. And beyond that, ratification, as Judge Brinkman found, all of these clients received substantial benefit from this litigation. It was all paid to them. Mr. Lohman simply took his attorney's fee out of it, which he said that he had a right to do because he conferred a benefit on these people. So they ratified it. And ratification goes back to the time of execution. So that's what I want to get into. Assume there is some evidence. You may dispute it. I'm not really. I just want to play this out. Assume there's some evidence that there was initial demands, initial lawsuits without client approval. If the damages are the attorney's fees from the resolved cases, those clients would have permitted the settlements or agreed to them. So that's the ratification point. Even if there was evidence on the front end, and that may be an issue that may be good, that's probably bad if it's true, and maybe a violation of something. But from a claim for damages, if you ultimately agreed to the result of that, you'd say it's been ratified.  And there wasn't, like I said, there wasn't a single client that came to trial to testify, Jeff Lohman defrauded me. Jeff Lohman stole my money. There was no testimony to that effect. In any way, Naviant – That's not the claim. The claim is that Naviant says you defrauded me by saying you represented borrower A. You didn't represent borrower A. In response to that, I litigated, paid attorney's fees to bring a lawsuit based on a representation that you represented someone that you didn't. Maybe under the standard we look at, that part of a fraud claim might have some merit, as I think about it. But I think your response is, even if that's true, the damages claims here all relate to settled cases or cases where someone got some benefit. And if there was some question perhaps on the front end, it was ratified by the time they settled. Yes, and there's a ratification argument. And I will also point out that in every arbitration, 40-some briefs, and they're all in the appendix, Naviant argued this unclean hands defense, which is essentially the same argument that they make on the RICO claim. These claims are manufactured. Clients didn't give approval. Clients were told to not pick up their phones. All of these claims that are supposedly the fraud from September of 2017, when the first brief was filed in the McLogan case, all the way through until even after we filed the complaint, after they filed their complaint in April of 2019, they were still settling cases that Lohman brought after they filed this litigation. And in every case, they made this argument that the claims were manufactured and the claims were fraudulent. And in every case, that argument was rejected by the arbitrators. There is no support for it. And they're trying to, again, second bite at the apple. The arbitrators didn't agree with this, so maybe the courts will. You talked at the very beginning about the Norr-Pennington doctrine and rules. Your colleague says that applies only once a lawsuit begins. Your argument seems to be that that's not right. That what happens pre-litigation is what lawyers do, and that's not erroneous. Is your argument that Norr-Pennington applies to pre-litigation, or that for a different reason, pre-litigation conduct is not improper? Both of those arguments. Yeah, yeah. Both of those arguments. So there isn't, at least as recently, I've looked at this issue many times. Because it's always been, obviously this was arbitration, and a lot of the conduct they complain about was this pre-litigation conduct. One thing I want to be clear about is that Mr. Lohman came in, he has no relationship with GST, no relationship with these lead generating firms. Whatever happened over there had no concern to Mr. Lohman. He just wanted people that were getting phone calls. And he very much disputes the fact that he told people not to pay their debts. Because you don't get phone calls unless you're defaulting on your debt. He only wanted people that were getting phone calls. He's a TCPA lawyer. I don't mean to cut you off, but I want your authority that Norr-Pennington applies to pre-suit stuff. So you can say whatever, but you're over time, and I've put you over time, but if you have an answer to that, I'd like it. It's the Eurotech case, which is an Eastern District of Virginia case. And then the Sosa versus Direct TV case out of the Ninth Circuit, which talks about the breathing space of litigation. And arbitration is definitely within that breathing space. And if you look at Sosa, it was demand letters that were essentially sent out by Direct TV. One of these Norr-Pennington cases, I think Judge Floyd and I may have been on. Tell me again, you all are talking about the Norr-Pennington Doctrine. What's your understanding of the Norr-Pennington Doctrine? What is it? Tell me. Well, we have a First Amendment right here. We have a lot of cases up here. Sometimes you're talking in Greek. Go ahead. Well, I could – I have taught a class on Norr-Pennington since this case came out. No, that's good. That's good. You cited that case that we were on. What's that? When I said I think there was a Norr-Pennington case that I was on with Judge Floyd. Watch Apple probably. And somebody else, but I think the third judge wrote it. Go ahead. I just want to go on the record here in this argument what the Norr-Pennington Doctrine is. The Norr-Pennington Doctrine essentially says that you can't be sued for exercising your First Amendment right to petition the court unless the lawsuit is a sham. And successful lawsuits are not sham lawsuits. So immediately exit. I just wanted to get that out there. You both have talked about the doctrine, but nobody said what it is yet. We've talked about sham litigation. That's what was – and the judge let it go to the jury, and then she said there's no sham litigation. Well, are the terms baseless and sham synonymous? Well, to be sham litigation, it has to be objectively baseless, and that's in the court's instruction to the jury. And here – The jury came back with questions about what sham litigation was. Yes, and it has to be an abuse of the judicial process. And again, well, this damage chart that they submitted, that was their only evidence of sham litigation, a list of cases that were won and lost. And if you look at the one arbitration award that was part of the evidence that went in favor of Naviant, we put that into evidence, and that's the Daniel Lewis Arbitration Award, which is at JA 568-1. And that's the only arbitration award where there's any reasoned analysis of why the arbitrator ruled in their favor. The arbitrator says, this is part of the long history of evolving TCPA law. Here's Naviant's arguments. Here's Lohman Klein's arguments. Both have authority to support their positions. I find Naviant's arguments more persuasive. He rules in favor of Naviant. No attorney's fees awarded. No costs awarded. Nothing awarded. And there is no indication in this one opinion that's part of the record to indicate that this is sham litigation. The dismissals don't evidence sham litigation because they were voluntary. There were voluntary dismissals that were signed by Naviant. Naviant did not reserve any right to collect fees. Naviant, both parties bore their costs. The dismissals were without prejudice. So he can say those dismissals evidence something. They evidence that the parties walked away from the claims, which happens all the time. Was Lohman supposed to keep litigating claims because the plaintiff dropped out? Or a lot of the claims, Sallie Mae and Naviant, their relationship to the debtors changed and Naviant was sued when it should have been Sallie Mae or vice versa. A lot of claims were dismissed on that basis. And, of course, the settlements on this damage chart don't indicate sham litigation. There's no, zero evidence of sham litigation. We kept you going a long time. Thank you, Your Honor. But you've been asked questions and Judge Waldbaum may have another. I'm sorry. No, no, that's fine. I've got one more question. I had asked your colleague to come back and show me the JE evidence that there's damages sought by Naviant other than attorney's fees. It sounds like your position is that's incorrect. The only damages they sought were that chart you've just been referring to. The chart includes settlements they paid and loans that were forgiven. So he put all of that into evidence. And then for cases where they were dismissed or Naviant got a favorable ruling, that's where their damages are limited to cost and attorney's fees. Okay, I got you. So you would agree that settlement amounts, not just attorney's fees, are in evidence. You just would dispute that they're proper damages. They're successful litigation. I mean, I don't know how that sham litigation went. I understand. Thank you. We either won. Well, they pulled out the cases we won before the case went to the jury because obviously there's a huge causation issue there and they didn't want the jury to have them. So they pulled those five cases out. So the only cases that went to the jury were the cases they won, the cases that were dismissed, and the cases that were settled. But in the settled cases, that includes loans forgiven and cash payments made to the borrowers in addition to attorney's fees and costs. You've saved a couple minutes, Mr. Bell. Okay, thank you. But we have Mr. Charnoff on the list. You've got some time, sir. Good to have you with us. Thank you. It's very good to be here. It's been a couple years. May I please support? Good morning. Mike Charnoff on behalf of the GST Appalese. GST is a company, GST Factory, Inc., and I represent two individuals, Greg Tremarch, he's the T in GST, and Rick Graff, he's the G in GST. I only have a few minutes. I want to start by pointing out that on August 20th of 2021, the Fourth Circuit issued an opinion called SARDIS, it's in the brief, SARDIS versus Overhead Door Corp. And it's essentially affirmed and discussed the Rule 50 standard and discussed why we have it and how we apply it and that the moving party is entitled to assert those same arguments here on appeal. That happened to be the very same day that our district court allowed a completely baseless case to even go to verdict. And there's been some colloquy about, you know, why did it go as long as it did? And I just want to briefly echo that there's repeated references in the record that I'm going to let this play out. And this court, I thought the court was going to dismiss it at the close of the plaintiff's case, and then I thought they were going to dismiss it at the close of the defense case, and then we renewed it. And so I think there was shock or surprise that the jury did what it did, but that's important. It goes to the Rule 50 standard because the task here is to determine whether there was a legally sufficient evidentiary basis for a reasonable jury to render the verdict that it did. And so while the ultimate ruling is a relatively brief and straightforward, narrow, dispositive ruling that wipes out all the claims, I don't want this court to lose sight of the fact that there's more than half a dozen dispositive arguments all over the record that we argued repeatedly to the trial court. But they were rejected. They were not rejected. I mean, you either won, your motions were denied. I mean, I hear you saying the district court was essentially saying, I agree with you, but I'm going to let this play out. But the net effect of that is to deny the motions. That's correct. But this court always has the ability to affirm on any basis fairly supported by the record. And so let me start with one issue, which I think is the lowest hanging fruit, just as it's so illustrative, on the tortious interference with contract count. They found, the jury found in favor of a defense verdict of both of my individuals, the G., Rick Graff, and the T., Gregory Tramarsh, they were found to be without liability. And yet they found liability against GST on the tortious interference count even though there's no agents to do it. And one of the jury questions, we discussed one jury question, one of them was they asked how do we distinguish between individuals and entities, and Judge Brinkman gave them a very succinct and correct statement of Virginia law that entities only can act through their agents and employees. And if Rick Graff wasn't tortiously interfering with the contract and if Gregory Tramarsh wasn't and there was no testimony about the S., a guy named Buddy Severs, who didn't testify at trial, hardly mentioned at all, if there's no agents who could be tortiously interfering with the contract, how on earth can you exonerate the individuals and then fine the company today? There was zero testimony, none, about any employee. So it is an utterly senseless and completely unsupported. And I only use that as just an easy example, but the record is just replete with it. I know I've only got a couple of minutes. But just going into the Count II RICO, you know, there was uncontradicted evidence that there was no association, in fact, enterprise, and that my clients did not conduct the enterprise through a pattern of racketeering activity. Both Mr. Tramarsh and Mr. Graff testified that their purpose, their sole purpose, was to give private student loan debtors affordable access to attorneys who can assist them. That was it. That was the only testimony as to their purpose. No one else testified about that, and all of this came in through Navion's case. Conversely, the GST appellees had no point or purpose to file TCPA claims. The undisputed testimony was that GST is not a law firm. Mr. Graff is not a lawyer. Mr. Tramarsh is not a debt relief attorney. The GST appellees never filed a TCPA claim. They never suggested anyone do so. The only testimony was that they didn't even know what the TCPA statute was. They never told Attorney David Mize about the TCPA, and he testified the same way. No contrary evidence. Again, zeroes. That's the standard in Rule 50. There has to be some evidence, legally sufficient evidence, that a reasonable jury could credit. It doesn't exist here. GST didn't have the purpose to defraud Navion. The only testimony was that GST and these two principals didn't even know that Navion existed or who Navion was until the very end of the timeline. How could they possibly have a purpose to defraud them? Mr. Tramarsh's testimony was that the GST appellees never counseled. I'm sorry. My time is over. May I finish my thought? You can finish. Thank you. Mr. Tramarsh's testimony was that the GST appellees never counseled the borrowers to stop paying loans. They had no communications with the borrowers at all. And, again, the uncontradicted testimony was that there was no relationship between the Lohman appellees and the GST appellees. Never a phone call, never an email, a text message. There was zero communication between these two different groups of appellees. And that's all of the testimony in the form of testimony from the stand, interrogatory answers, all of which Navion introduced into the record and had nothing to rebut it. That was uncontradicted testimony that Navion put into the record. And so it was literally impossible for any reasonable jury to have any legally or any basis to make have made any of these findings. So I understand that the court's ruling was a narrow one, and I think it's completely effective and dispositive. But I just want the court to keep in mind that you can affirm on any number of bases. And the torts interference claim, I just used that as an easy example, is completely unfounded. And, frankly, this is why we have Rule 50, because sometimes even the best-meaning and well-intentioned jury can be led astray. And this is why we have Rule 50, to prevent this sort of abuses. Is there any questions for me? Thank you very much, sir. Thank you. Good to have you with us. Thank you. Mr. Calhoun? Thank you, Your Honors. George Calhoun for Navion. Several things I want to address in response to that. First, it's a little bit telling that they think the jury got everything wrong. It's not a narrow issue that they're complaining about. They think the jury got everything wrong. And that's just not the case. I want to address briefly the crime-fraud issue that my colleague raised. That ruling was completely vindicated by the RICO judgment of the jury. It's notable that the decision overturning this case made no decision whatsoever about the underlying merits of what happened. It's a causation ruling. In other words, if we had presented our damages differently, there wouldn't even have been an issue. So the findings of the RICO conduct, not even challenged on appeal. There is no appeal that the RICO predicates weren't proven. So that's pretty telling. The crime-fraud issue is bulletproof, in my view. None of my opponents have really addressed the standard that we're dealing with here, whether there's any evidence to support the jury's verdict. They've made wholesale arguments as if this were the district court once again. Because they haven't disputed, really, any of the evidence we put in, they haven't met their burden of proving that there's no evidence that supports the ruling. On this issue about connectedness with GST, I'll rely on the language of one of the settled defendants, who in describing this enterprise, mind you, he described it as an enterprise. This isn't our language. One of the more remarkable smoking guns you might see in a case. Scott Frieda, who was one of the defendants, was complaining in an email to defendant David Mize, and he noted how GST had built out the enterprise, and Mize had helped to build out the additional layers, the additional layers being the Lowman defendants, who were brought in because the scheme was having cancellation problems. They were bringing in all these borrowers, taking their money, having them stop paying their lenders, and the borrowers were figuring out that nothing was being done, and they were canceling. So they brought in the Lowman defendants as an effort to reduce the cancellations by bringing these lawsuits. I wanted to address the question you'd asked my opponent about Norah Pennington. It originally started as an antitrust concept, Your Honor. I remember some of that, but you don't use language around terms sometimes that need to be spread on the record. Yeah, it can see how it would be confusing. I will note that I disagree with the statement that anything pre-litigation can give rise to Norah Pennington. So you differ with his definition? I do, and I think the critical point here is that a lot of the conduct here, remember we have a RICO conspiracy here found by the jury, and a lot of the conduct involved creating the conditions where they could bring a lawsuit. It wasn't just a client came to them and they said, I'm going to bring a lawsuit. If they had just filed a demand letter, if someone called them and said, I'm getting these calls, I don't like them, let's send a demand letter, we might have a different case. But they were running people through this pipeline to try to create the conditions where they could even possibly send such a demand letter by having them default on their loans when they weren't their clients at that point in time. And I'll also note that the Fourth Circuit hasn't ruled on this, but courts in the Eastern District of Virginia have concluded that Norah Pennington doesn't even apply to private arbitration because that's not a petition in the government. That's a private dispute. Only five of these cases were filed in court. The rest were private arbitrations. That's the Ford Motor Co. v. National Indemnity Company from the Eastern District of Virginia in 2013, 972 F sub 2nd 862. And the district court didn't rule on Norah Pennington, but to the extent that you're considering that, it really applies to a small subset of the claims here. It's not dispositive, and there's substantial basis to support the jury's damages verdict regardless of whether you kick out a few here or a few there on any basis. And almost all of their arguments are going to nibbling around the edges. The core of the jury's verdict is eminently supportable, and that's the point that's important here. There are arguments that we didn't present any evidence about the damages on this point is also not true. Mr. Standish, who is an executive at Navient, testified at length about how the lack of the nonpayment, when these borrowers defaulted, how it impacted Navient's bottom line. There was significant testimony on that. It's cited in our briefs. They have two cross appeals. I'll just mention them briefly. I don't know if you're on. One, they complain about expert issues. The court admitted testimony from experts on reasonableness of attorney's fees. As to their expert that we called, they've admitted that that testimony was not helpful to Navient. That means it's harmless error. You don't need to consider it under any circumstance. As to Navient's expert, they cite his Virginia cases for the prospect that there's a rule requiring expert testimony to support the reasonableness of attorney's fees. The cases they cite all reach the opposite conclusion, that expert testimony was not required. In any event, there's no federal rule, and Navient had attempted to call this expert in their own case in chief. It was the district court's decision to hold that. My time is up here. I don't have to stop there. Thank you very much, Mr. Calderon. Thank you. Mr. Greel. The confusing part in this whole fact pattern is you have to look at where Lowman comes in. Lowman's only connection to the enterprise is through Mize, Slaughter, and Johansson. These are the three lawyers that were hired by GST to try to help these student debtors. It's interesting that Navient says, oh, these guys are all a sham. They weren't trying to help anybody. These lawyers were brought in, and they were trying to figure out ways to help these students. It just so happened that Jeff Lowman had a conversation with David Mize, and Jeff's a TCPA lawyer. And he said, well, are they getting phone calls? And Mize said, yeah, from Navient. And Lowman's like, oh, well, Navient never abides by the TCPA. We'll just start interviewing them and advising them to revoke their consent and to log their phone calls. And that's $500 a phone call. And once we reach a level that makes economic sense, we'll file a lawsuit. That was where Lowman came in. Lowman had no contact with anybody but the three lawyers that were referring Navient calls to him. He had no contact with anybody at GST, none. And in any event, when he says that Navient was injured because students were advised not to pay their debts, Navient does not own these loans. They're owned by trusts, and Mr. Standish testified to that. Navient is only a loan servicing company, and they were obligated to reimburse those trusts when they screwed up, and they screwed up in this case. And for that reason, they ended up paying cash settlements to Lowman's clients and forgiving debt. It was their decision to forgive the debt, not Lowman's. He would have been happy to take a cash settlement. They wanted to write off the debt because it was better for their bookkeeping. But there was no damage to Navient because loans weren't paid. That was all to the trusts. And to the extent there is some residual benefit that Navient gets, under the Galbraith case, residual beneficiaries don't have standing under RICO. And to go to this last point about damages, obviously the successful litigation, the cases that were decided in Lowman's favor, how can they claim that as damages? They either decided to do that or they lost a fair fight. And when you get down to the dismissals and the cases that they won, this question on our cross-appeal is critical. They presented no expert testimony to establish the reasonableness of their fees in any jurisdiction, nor their costs. They tried to call our expert witness in their case in chief, which the judge allowed them to do. Our expert said their fees aren't reasonable, at least as far as Virginia and Maryland is concerned where I'm authorized to practice. And I'm sorry. My time is over. But no expert witnesses. We understand your position. Got it. Thank you so much. Thanks very much. We'll come down and greet counsel and then take a short break.
judges: Robert B. King, A. Marvin Quattlebaum Jr., Henry F. Floyd